UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------x
UNITED STATES OF AMERICA

vs.                             3:22-MJ-619

DUANE HOLLENBECK,

                         Defendant.
-------------------------------------------x

     Transcript of a Video Detention Hearing held

on October 24, 2022, the HONORABLE ANDREW T. BAXTER,

United States Magistrate Judge, Presiding.


A P P E A R A N C E S

(By Microsoft Teams)

For The Government: UNITED STATES ATTORNEY'S OFFICE
                    P.O. Box 7198
                    100 South Clinton Street
                    Syracuse, New York  13261-7198
                      BY:  GEOFFREY BROWN, ESQ.

For Defendant:      FEDERAL PUBLIC DEFENDER'S OFFICE
                    NORTHERN DISTRICT OF NEW YORK
                    4 Clinton Square
                    Syracuse, New York  13202
                      BY:  GABRIELLE DiBELLA, ESQ.


*Jodi L. Hibbard, RPR, CSR, CRR*
*Official United States Court Reporter*
*100 South Clinton Street*
*Syracuse, New York  13261-7367*
*(315) 234-8547*

1          (All present by Microsoft Teams, 1:06 p.m.)

2          THE CLERK:  This is United States versus Duane

3     Hollenbeck, Case Number 3:22-MJ-619 for a detention hearing.

4     Counsel, please state your appearances for the record.

5          MR. BROWN:  Geoff Brown for the United States, good

6     afternoon, your Honor.

7          THE COURT:  Good afternoon.

8          MS. DiBELLA:  Good afternoon, Gabriella DiBella on

9     behalf of Mr. Hollenbeck who's also appearing by

10    videoconferencing.

11         THE COURT:  All right, good afternoon.  So

12    Mr. Hollenbeck, we discussed this before but you have no

13    objection to having this detention hearing go by way of this

14    video connection?

15         THE DEFENDANT:  That is correct.

16         THE COURT:  Okay.  I will find under our General

17    Order 59 based on the lingering COVID concerns and the

18    logistics involved that a, it is appropriate to conduct this

19    detention hearing by way of a video connection.

20         So Mr. Hollenbeck, the government has the burden to

21    prove that you constitute a danger to the community by clear

22    and convincing evidence or a risk of flight by a

23    preponderance of the evidence and that no condition or

24    combination of conditions would adequately address those

25    risks.  Because they have the burden of proof, they're going

3

1    to go first.  They typically proceed by what we call a

2    proffer which means that they summarize the evidence they're

3    going to rely upon rather than calling witnesses.  When

4    they're done, Ms. DiBella is going to be able to present your

5    side of the case, and then I will make a decision.  So you

6    understand what's going on here today?

7            THE DEFENDANT:  Yes, sir.

8            THE COURT:  All right.  Mr. Brown.

9            MR. BROWN:  Thank you, your Honor.  The government

10   would request to proceed by proffer.

11           THE COURT:  Granted.

12           MR. BROWN:  Thank you, your Honor.  In making a

13   detention determination, the court must consider the

14   following factors:  Nature and circumstances of the offense

15   charged, including whether the offense is a crime of

16   violence; weight of the evidence against the person; history

17   and characteristics of the person; and the nature and

18   seriousness of the danger to any person or the community that

19   would be posed by the person's release.  To support detention

20   based on danger, government proof must be clear and

21   convincing, while risk of flight must be preponderance of the

22   evidence.

23           With respect to this case, the nature and

24   circumstances of the offense charged, by complaint defendant

25   is charged with possession of a short-barreled rifle not

1  registered with the NFTR.  On or about June 20th, 2022, he

2  possessed that firearm at issue in this case as well as what

3  can only be described as an arsenal of weapons.  Those

4  weapons ranged from short-barrel assault rifles to ghost guns

5  to silencers and were stored in an open, unsecured home that

6  he owned in which his two children, one of them still a

7  minor, had unfettered access to and one of whom lived in that

8  location.

9        The weight of the evidence against the defendant in

10  this case is overwhelming.  In a post-Miranda

11  audio/video-recorded statement, the defendant admitted to not

12  only owning the firearm in question but to building it

13  himself and purposely using a ten-inch barrel on the firearm.

14  Defendant also admitted to owning all the firearms at the

15  residence and the silencers and making many of them with his

16  children.  His adult son, who's now 19, has resided at the

17  home for four or five years unsupervised with these weapons,

18  stated that all the weapons inside the home were owned by his

19  father and provided a sworn statement to that effect

20  confirming what the defendant has also said.

21        As far as history and characteristics of the

22  defendant in this case, we have a defendant who has a history

23  of two sex abuse third convictions and an assault third

24  conviction -- I'm sorry, sex abuse third and two assault

25  third convictions with intent to cause physical injury.  One

1   of the assault third convictions is a domestic violence

2   misdemeanor conviction which makes him a prohibited person

3   for owning firearms under 18 U.S.C. 922(g)(9), as he was

4   convicted as a misdemeanor crime of domestic violence.

5        With respect to danger to the community, it's hard

6   to imagine a larger threat than somebody storing an arsenal

7   at his home that he's providing to his children who both

8   himself and the children have espoused using said weapons

9   against their community.  With respect to this defendant,

10  he's got this arsenal designed to create mass casualties with

11  silencers, he's openly advocating in some of his posts for an

12  armed movement against the government, encouraging people to

13  go to D.C. on his political Facebook pages discussing taking

14  out a local government, going to D.C. armed.  When federal

15  agents interviewed him about his posts, he lied to them about

16  the amount, nature of firearms he had.  When he was

17  questioned about whether or not he had any of the firearms to

18  carry out these crimes, he claimed to only have a shotgun.

19       He has two children, one of whom is still a minor,

20  and that minor threatened, which the defendant knows, that he

21  was going to commit a Parkland-style attack on his school, a

22  threat for which he was suspended for the rest of the school

23  year, 70 days.  How did the defendant respond to that

24  horrific event?  He responded by providing that child with

25  access to the firearms that that child can use to

1   successfully perpetrate another Parkland.  Such a horrific

2   attack on his classmates and his community is absolutely

3   being facilitated by this individual.  That child, with those

4   same weapons owned by the defendant, can be seen holding them

5   in a picture posted on social media by his other son.  These

6   same weapons were recovered by the agents in the defendant's

7   cabin.

8        Compounding matters, in an interview with that

9   child after the initial set of guns were recovered, the son

10  further admitted that the father had given him a pistol that

11  he stores at his mom's house.  That .45-caliber pistol, made

12  by the defendant for his son after these threats, was

13  recovered from that residence.  The 19-year-old child who's

14  been living in that cabin for years surrounded by these

15  weapons was investigated for threatening to blow up his

16  school and for bringing shell casings to school.  How's that

17  son found living?  Surrounded by an arsenal of his father's

18  weapons, unsecured throughout that home.

19       After that search, three other guns were turned in

20  by Alec, location where he was storing them is unknown, and

21  those were another assault rifle with a large capacity

22  magazine, a rifle and a shotgun.  These late and continued

23  recoveries of more and more weapons leaves the government

24  with no confidence at all that all of the firearms in this

25  case have been recovered.

7

1          In conclusion, given the factors in 3142(g), the

2    court should find there's no condition or combination of

3    conditions that would assure the appearance of the defendant

4    and the safety of the community.

5          With respect to risk of flight, the defendant is a

6    long haul trucker, he's facing a significant sentence, and

7    his willingness to contravene the laws related to firearm

8    ownership and lie to agents about it make him a risk of

9    flight as well as the previously-mentioned danger to the

10   community.  Thank you, your Honor.

11          THE COURT:  Okay.  Ms. DiBella.

12          MS. DiBELLA:  I will start first with the risk of

13   flight.  I would note that Mr. Hollenbeck is a resident of

14   the Northern District of New York and has been for his entire

15   life.  He's always lived in this area.  His family is in this

16   area, he does have a significant other and his children in

17   this area.  He's very involved in his community in terms of

18   working, he's always held steady employment in this area.  He

19   is a long haul trucker but he is based in Moravia and he's

20   working as a milk tank trucker now.  And so he is always in

21   this area, he's going to remain in this area.  He has no

22   motivation to leave the current area that he's residing in

23   because his family is here, his significant other is here,

24   his work is here.  So he has a history of full-time

25   employment in this area and he advises that he could go back

1    to that job if he were released so he has every incentive to

2    stay here, to continue working here, and providing for his

3    family.

4              In terms of being a danger to the community, so

5    this is charged as a possession case.  I'm unaware of any

6    evidence that there was any distribution of firearms.  I

7    understand that there are allegations that there were at

8    least one minor child that had access to firearms.  I've seen

9    a picture that was submitted by the government, but there are

10   no allegations that these firearms were ever distributed to

11   anybody else, that they were sold or borrowed or anything

12   like that.  So these are firearms that were found at a

13   seasonal camp.  Mr. Hollenbeck inherited this camp when his

14   father passed, it's seasonal, it's like a hunting cabin, it's

15   kind of out in the woods and Mr. Hollenbeck uses the cabin

16   primarily for target practice.  He would go out there and he

17   advises that he would shoot clay pigeons, steel gongs, soda

18   cans, go out there for target practice.

19             The government has mentioned some posts on social

20   media, I have seen some of these posts.  Mr. Hollenbeck

21   advises that he would share some posts just to kind of see,

22   you know, what people's opinions were.  He did post a lot of

23   things related to religion and religious opinions just to

24   kind of see, you know, what people were thinking, and kind of

25   put some contrarian views out there.  That is something that,

1   you know, he is open about.  When he was confronted about his

2   posts by the FBI, I believe this was back in October, he was

3   confronted about a post, he was open and cooperative with the

4   agent and he did, he spoke with them voluntarily, twice.  So

5   he could have hung up the phone and said, forget it, you

6   know, I have no obligation to speak with you, leave me alone.

7   He didn't.  He spoke with them twice and he told them what he

8   knew.  Not only that, he gave them his phone.  So he turns

9   his phone over and says, you can take a look at it, you can

10  find, you know, what you want on my social media, find these

11  groups, find these posts, and they did.  So he's been open

12  about that.

13         I would also note that the pretrial report notes

14  that probation believes that he can be supervised, there are

15  conditions or combination of conditions that can assure that

16  he does come back to court and assure that he is not a danger

17  to the community, and so I think that there are conditions

18  that would help.

19         The government has concerns about firearms not

20  being located.  Obviously if he were released and there were

21  a condition that he were not to possess firearms and he were

22  later found to be in possession of firearms, it would be a

23  significant problem, not only in terms of his release status

24  but also any future criminal liability.  I think checking in

25  with a probation officer even if it's just by phone, I think

1    checking in with a probation officer could also help so they

2    could be assured that he is where he says he is, he's doing

3    what he says he's doing, and he is working and spending time

4    with his family.

5         So I think that there are some restrictions that

6    can be imposed on Mr. Hollenbeck to be released that can

7    address some of these concerns.

8         THE COURT:  Mr. Brown?

9         MR. BROWN:  Your Honor, I -- in this day of school

10   shootings, when a parent is providing his children with

11   weapons of mass carnage, having known about both of their

12   previous threats to those schools, and the fact that one of

13   his children was suspended for 70 days for that threat is

14   beyond troubling to the government.  I can't understand it on

15   any level.  I fear that it will continue if he's released.  I

16   have no confidence that given their love for guns and his

17   love for guns that that won't continue, and I believe

18   detention is appropriate.  Thank you, your Honor.

19        THE COURT:  All right.  Just for the record, I

20   would confirm that the government has submitted an Exhibit A

21   which includes some of the posts, a law enforcement report

22   from the FBI, some of -- when I say the posts, I mean

23   Mr. Hollenbeck's social media posts, as well as photographs

24   of a number of the weapons.  I also received a letter of

25   support on behalf of Mr. Hollenbeck from his significant

1    other Amy Schiavi.  All right.  Is there anything else from

2    you, Ms. DiBella?

3              MS. DiBELLA:  Your Honor, I would just highlight

4    that I'm not sure the extent of which Mr. Hollenbeck knows

5    about the one event that Mr. Brown is referring to in terms

6    of the Parkland school shooting comments.  The reports that I

7    have, I'm not sure that they indicate that Mr. Hollenbeck was

8    ever actually talked to or interviewed regarding that.  I

9    believe that they went and interviewed the minor's mother

10   about that, so I really can't say for sure what his knowledge

11   and understanding was of that event.

12             THE COURT:  Mr. Brown, anything further?

13             MR. BROWN:  Well, with respect to that, his child

14   was suspended from school for 70 days, I would think why that

15   happened probably came up.

16             THE COURT:  Okay.  Fair enough.  All right.  So

17   presently before the court is the government's motion for

18   pretrial detention of the defendant Duane Hollenbeck.  The

19   defendant has been charged by complaint with possession of an

20   unregistered short-barreled rifle, in violation of Title 26

21   United States Code Section 5861(d) and 5845(a)(3).  The

22   government has moved for detention based on risk of flight

23   and danger to others and to the community.  The detention

24   motion may be based on danger under several sections of the

25   Bail Reform Act.  Some of them have been questioned because

1    of the recent Supreme Court cases about what constitutes a

2    crime of violence and, you know, I think all of -- all of the

3    relevant sections apply but most clearly, because the

4    defendant is charged with a felony that is, may or may not be

5    a crime of violence, it involves possession or use of a

6    firearm or destructive device under 18 U.S.C. Section

7    3142(f)(1)(E) that allows the government to move for

8    detention based on danger.  It is probably also, based on

9    case law which I don't need to recite, a crime of violence

10   for the purposes of the Bail Reform Act, whether categorical

11   crime of violence or one that falls under a residual clause,

12   but rather than getting into the debate about the first two,

13   I'm going to make, it's clear under 3142(f)(1)(E) that the

14   government can move for detention based on danger because of

15   the involvement of a firearm in this felony charged.

16         A detention hearing was obviously conducted today.

17   The court has considered the pending charges which are set

18   forth in a criminal complaint of six pages.  As I mentioned,

19   the government submitted a fairly detailed Exhibit A, I have

20   a letter of support and a pretrial services report as well as

21   obviously the proffers that the parties made today.  To

22   support its motion for detention, the government, as it

23   acknowledges, bears the burden of proving risk of flight by

24   preponderance of the evidence and of proving danger to others

25   or the community by clear and convincing evidence.  That is

1    established by, among other cases, *United States v. Artis*,

2    607 F.App'x 95 at 96, a Second Circuit case from 2015.  The

3    factors for the court to consider, again, as the government

4    acknowledged, include the nature and characteristics of the

5    offense charged; the history and the characteristics of the

6    defendant; the weight of the evidence against the defendant;

7    and the nature and seriousness of the risk to the community

8    if the defendant were to be released.

9         I conclude that the government has sustained its

10   burden to prove, by clear and convincing evidence, that the

11   defendant presents an unreasonable risk of danger to others

12   and to the community through his possession of dangerous

13   firearms and conduct that risks inciting others to acts of

14   gun violence, and that no condition of release will

15   adequately mitigate that risk.  In light of that finding, I

16   won't dwell on risk of flight as to which I think the defense

17   makes a stronger case.

18        In terms of the nature and the characteristics of

19   the offense charged, in addition to the short-barreled rifle

20   recovered from the defendant's cabin, which is the basis for

21   the pending charge, the FBI found what I think Mr. Brown

22   appropriately characterized as an arsenal of other

23   semiautomatic firearms, including three AR-15 style rifles,

24   some of which were unserialized, five unserialized pistols,

25   assembled from Polymer80, Inc. to mimic Glock pistols, and

1   five metal tubes or canisters believed to be homemade

2   silencers.

3          As noted by Mr. Brown, the sons of the defendant or

4   one son of the defendant subsequently produced several

5   additional firearms that were not found in the search.  The

6   government's exhibit provides evidence that defendant's

7   conduct risks inciting others to engage in dangerous and

8   violent conduct involving firearms.  The defendant's two

9   teenage sons have been involved in incidents in school

10  involving threats of gun violence and were involved in a

11  social media image posted by the younger son of the older son

12  brandishing the short-barreled rifle and an AR-15 style

13  rifle.  The older son's purchase of large quantities of

14  ammunition helped tip off law enforcement about the potential

15  dangers posed by him and his family as indicated in the

16  complaint, and most telling, the government in Exhibit A

17  produced a Facebook communication where the defendant urged

18  other "patriots" to go to the District of Columbia for what

19  appeared to be a tentatively planned event and saying, and

20  I'm quoting, "We won't be waving flags, or holding signs.  We

21  are going in armed."  One member of that group replied,

22  according to the first page of Exhibit A, I'm quoting, "About

23  time, let's go!"  So I do think the -- not only the charge

24  that is pending but the surrounding circumstances as

25  reflected in the complaint are particularly alarming.

1          As noted, I'm not going to dwell on flight.  The
2     defendant is a lifelong resident of Central New York.  His
3     work as a truck driver I suppose gives him some additional
4     opportunity to flee, but that's really not the issue here.

5          In terms of the criminal history of the defendant,
6     he has a 1990 sexual assault misdemeanor conviction at age 20
7     for which he was sentenced to 60 days.  He has a 2016 arrest
8     for sexual abuse first based on his ex-wife's allegation of
9     rape.  He was sentenced to three years probation.  It was not
10    clear from the pretrial services report what charge he pled
11    guilty to.  He also had a 2016 assault third misdemeanor
12    which led to a 60-day sentence and a three-year probationary
13    term.  The defendant completed both probationary terms at the
14    maximum expiration date with no apparent violations which is
15    obviously a point in his favor.

16         The defendant, according to the pretrial services,
17    has no -- report has no history of substance abuse or mental
18    health issues.

19         The government I think fairly characterized the
20    weight of the evidence against the defendant as very strong.
21    His sons basically gave the government access to the cache of
22    weapons at the defendant's cabin, acknowledged their dad
23    owned them, and the defendant subsequently, after being
24    Mirandized, admitted to not only owning and possessing those
25    rifles but building some of them from internet kits into

1   unserialized firearms.

2           In terms of the nature and the risk, seriousness of

3   the risk to the community, I'm going to quote extensively

4   from a District of Connecticut case from 1994, *United States*

5   *v. Dodge*, 842 F.Supp. 643 at 644 to 645.  And it's not

6   entirely applicable but it basically accentuates the risk of

7   danger to the community from possession of weapons that are

8   defined under the RFA.  "The term 'firearm' is narrowly

9   defined in 26 U.S.C. Section 5845 to include only those

10  weapons and devices which Congress believed to be either so

11  inherently dangerous and lacking in legitimate utilitarian

12  purpose or so susceptible to misuse in criminal activities

13  that they should not be possessed by private citizens freely

14  and without federal regulation.  Because of the potential

15  danger which unregistered firearms pose to society, the

16  simple possession of such a firearm by a private citizen --

17  even one with no prior criminal record -- is a federal felony

18  offense.  Because of their dangerousness and the high

19  likelihood of their being employed to inflict grievous injury

20  on innocent victims, the simple possession of such

21  'firearms,' such as machineguns and sawed-off shotguns, have

22  been held to be 'crimes of violence' under 18 U.S.C. Section

23  3156 without the necessity of the government's proving that

24  the particular firearm was actually used."

25          The District of Connecticut case goes on to talk

1    about silencers.  "The noise of a firearm and the attention
2    that it attracts often are the only restraints preventing a
3    criminal from using a weapon in the commission of a crime.
4    By suppressing the report of a firearm, a silencer enables
5    the weapon to be discharged stealthily, without notice and
6    attention, thus eliminating that restraint and creating a
7    serious danger."

8           Similarly -- and that's the end of the quote.  The
9    manufacture and sale of firearms without serial numbers and
10   those which are not registered makes it more difficult for
11   law enforcement to investigate offenses involving the use of
12   such weapons.  The purchasers or the creators of such
13   difficult-to-trace weapons are more likely to be planning to
14   use them for criminal activity, so selling such weapons
15   creates a substantial risk of danger to the community from
16   criminal activity involving guns.

17          Now let me emphasize that I am not detaining the
18   defendant because of his beliefs or his contrarian opinions
19   or the fact that he may have expressed them on the internet.
20   I draw the line, however, at statements which would incite
21   others or conduct which would incite others or lead others to
22   consider using such weapons as weapons of mass casualty.  And
23   while I acknowledge that the sons have never carried out
24   their threats, the leaving one son in a cabin surrounded by
25   these weapons while he has displayed a tendency to make such

1    threats is beyond irresponsible and poses substantial danger

2    to the community.

3           Similarly, the incitement of potential patriots to

4    use weapons against the government suggests that we're not

5    just talking about a gun enthusiast who spends a lot of time

6    doing target practice.  These were semiautomatic rifles.

7    There's no need to use them in hunting, there's no need for

8    silencers in connection with hunting and sports and target

9    shooting, and it's just, you know, it has nothing to do with

10   one's beliefs or opinions, it has to do with the imminent

11   threat of danger to the community from the use of these

12   firearms.

13          I would also note that the defendant's criminal

14   history, although it may not involve a felony conviction,

15   indicates a history of impulsive and sometimes violent

16   conduct, which gives the court even greater concern that even

17   the most stringent of conditions of release would not prevent

18   the defendant from, or perhaps one of his sons from being

19   incited by some conduct and engaging in gun violence.

20          So I have considered alternative conditions of

21   release, even beyond those that were proposed by probation,

22   and I just do not, I cannot fathom a set of conditions that

23   would reasonably assure me that the defendant would not

24   continue to pose a serious risk of danger to others and to

25   the community.

1          I do want to say that, notwithstanding the fact

2     that I'm disagreeing with the suggestion of the probation

3     office, they come at this from the direction of the

4     background and the history of the defendant and they don't

5     focus, as the government does, on the circumstances of the

6     offense and the other evidence with respect to the

7     defendant's conduct.  So you know, I respect the probation

8     office and their opinions and I understand that the defendant

9     in many ways is a productive and decent member of the

10    community, and you know, he seems -- he's been shaking his

11    head the whole time so he seems to be insisting that he's not

12    the person that is portrayed by the government that has

13    persuaded me, but I just cannot ignore the overwhelming

14    evidence presented by the seizures from this defendant, his

15    comments on social media with others prone to gun violence

16    and his interaction or lack of supervision of his sons and

17    giving them the opportunities to carry out the types of

18    threats that they have made.

19          So based on all of that, it is the ruling of this

20    court that the defendant be detained pending further

21    proceedings.  Ms. DiBella, as is my practice, I'm going to

22    confirm this in a fairly brief order but rely on the

23    transcript of this proceeding for the underlying reasons

24    should your client choose to appeal.

25          All right.  Do we want to discuss the preliminary

1    hearing?

2          MS. DiBELLA:  Your Honor, I have spoken with

3    Mr. Hollenbeck last week about a preliminary hearing, what it

4    is in theory, what it would entail in reality, and what we

5    agreed is that if we received early discovery, we would waive

6    a preliminary hearing.  I have started to receive early

7    discovery and so we would be willing to waive the scheduling

8    of a preliminary hearing based on that.

9          THE COURT:  I will find then that the defendant has

10   made a knowing and voluntary waiver of his right to a

11   preliminary hearing based on the government's agreement to

12   provide early discovery.  I would note, Mr. Hollenbeck, that

13   the government can avoid having a preliminary hearing by

14   presenting the case to a grand jury and getting an

15   indictment, so, you know, practically speaking, it usually

16   never works out that a defendant gets a preliminary hearing

17   in any event.  So your client -- or your lawyer has done the

18   most she can with that strategic option and in return has

19   gotten early discovery which will help the two of you get

20   jump started on your defense against these charges.  All

21   right.  Is there anything further from the government?

22          MR. BROWN:  No, your Honor, thank you.

23          THE COURT:  From the defense?

24          MS. DiBELLA:  No, your Honor.

25          THE COURT:  All right.  The defendant is remanded,

1    court is adjourned.

2                    (Court Adjourned, 1:35 p.m.)

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4        I, JODI L. HIBBARD, RPR, CRR, CSR, Federal

5   Official Realtime Court Reporter, in and for the

6   United States District Court for the Northern

7   District of New York, DO HEREBY CERTIFY that

8   pursuant to Section 753, Title 28, United States

9   Code, that the foregoing is a true and correct

10   transcript of the stenographically reported

11   proceedings held in the above-entitled matter and

12   that the transcript page format is in conformance

13   with the regulations of the Judicial Conference of

14   the United States.

15

16                    Dated this 30th day of Novvember, 2022.

17

18

19                    /S/ JODI L. HIBBARD

20                    JODI L. HIBBARD, RPR, CRR, CSR
                     Official U.S. Court Reporter

21

22

23

24

25